594 A.2d 597

**Reginald Antuan WILKERSON and Darrell Edrick Wilkerson**

v.

**STATE of Maryland.**

**No. 1131, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Aug. 29, 1991.

174

Gary S. Offutt, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellants.

Tarra R. Deshields–Minnis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and John L. Scarborough, State's Atty. for Cecil County, Elkton, on the brief), for appellee.

Argued before MOYLAN, BLOOM, and IRMA S. RAKER, Specially Assigned, JJ.

MOYLAN, Judge.

This was a case just waiting for the Supreme Court's recent decision of *Florida v. Jimeno,* 500 U.S. ——, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), which totally controls its key suppression issue. Two cousins from Baltimore, the appellants Reginald Antuan Wilkerson and Darrell Edrick Wilkerson, were convicted by a Cecil County jury, presided over by Judge Donaldson C. Cole, Jr., both of transporting cocaine into Maryland and of possession of cocaine with intent to distribute. Upon this appeal, they raise the following two contentions:

1. That the evidence was not legally sufficient to support the convictions;  and

2.  That cocaine, found in a jacket pocket in the course of a consensual search of their automobile, should have been suppressed as the fruit of an unconstitutional search and seizure.

## Legal Sufficiency of the Evidence

■ From the evidence in this case, the only plausible conclusion that any rational fact finder could have reached was that the appellants had made a trip from Baltimore to Philadelphia to purchase a large quantity of crack cocaine, had made the purchase and, as they were returning to Baltimore, were picked up red-handed as they crossed the Delaware–Maryland line.[1]  Every implausible and inconsistent story they told about precisely when they left for Philadelphia, about why they went to Philadelphia, and about the car that carried them to and from Philadelphia only served to make their guilt more apparent.

On October 4, 1989, the appellants were stopped as they travelled southbound on I–95 just after having crossed into Maryland from Delaware.  They were stopped at 2:20 P.M. The automobile they were driving was a 1989 Chrysler New Yorker, bearing Virginia license tags.  Darrell Wilkerson was driving and Reginald Wilkerson was seated in the right front seat.  In the pocket of a jacket lying on the back seat, in a plastic wrapper wrapped with black tape, was 280 grams of cocaine of a purity of eighty percent.  The cocaine, if sold at that strength, had an estimated street value of $28,000.  If diluted to a strength of between thirty and fifty percent purity, as is the common custom, the cocaine would have had a street value of $44,800.

■ When stopped, Darrell Wilkerson told Trooper Vernon Conaway that he and his cousin had left Baltimore at about noon to make the trip to Philadelphia.  The stated purpose of the trip, at that time, was for the cousins to visit

---

1.  Their automobile was stopped for driving in excess of the 55 mile per hour speed limit.

their grandmother. When Trooper Conaway observed that, even under the most favorable of traffic conditions, the two travellers would have had a turn-around time in Philadelphia of, at most, "roughly a couple minutes," Darrell Wilkerson replied, "Yeah, well, we looked for her but we couldn't find her so we came back." With respect to visitors travelling that far only to be so easily daunted, the jurors may well have concluded that the trip had more to do with the cocaine on the back seat than with the grandmother. A false explanation is relevant evidence of consciousness of guilt.

When Reginald Wilkerson, the passenger, was questioned at the police station that evening, he stated that he and his cousin had left Baltimore for Philadelphia at about 7:30 in the morning. By the time Darrell Wilkerson took the witness stand, he placed the departure from Baltimore to Philadelphia at between 10:30 and 11 A.M. Reginald Wilkerson's testimony was consistent with that estimated time of departure.

By the time the appellants took the stand, the avowed purpose of their visit to Philadelphia, which in the original version to Trooper Conaway had only been far-fetched, became preposterous. Their purpose was, now, not to visit their mutual grandmother at all but rather their Uncle Omar. The mothers of the two appellants were sisters named Wilkerson. There was a third sister—the aunt of the two appellants. Her name was given as Helen Wilkerson, although it was stated that she was married to Omar Blankenship. Omar Blankenship was, thus, an uncle by marriage to the two appellants. Although Helen Wilkerson lived in Baltimore, her husband Omar Blankenship was in jail in Philadelphia.

By some strange confluence of the fates, both appellants, who lived separate and apart from each other and separate from their Aunt Helen, just happened to be present at Aunt Helen's house at 9 A.M. on October 4, when she received a telephone call from her husband from his jail in Philadelphia. He expressed to his wife the desire that his son and

daughter (or stepson and stepdaughter) come and visit him. Because it was somehow determined that the son and daughter could not or would not make the visit, the two appellants—mere nephews by marriage—spontaneously decided to make the visit instead.

One strange circumstance was that for Darrell Wilkerson, Wednesday, October 4, was a working day and Wilkerson was due at work by 9 o'clock. When asked why he didn't work that day, Darrell initially suggested that he had called in a week earlier and taken an entire week off to go to a funeral in North Carolina. When it was explained to him that October 4 was part of a different week than the one he had earlier testified about, he tentatively suggested that he had called in sick and finally explained that he called in and said that he was taking the day off to visit his uncle. He did not quite explain how he was already late for work when the very notion of a visit to the uncle first arose.

Odder still was the bizarre circumstance that Darrell hardly knew Uncle Omar. At the time of trial, Darrell was 21 years of age. He had not seen Uncle Omar since he was "about 12" years old. His testimony in this regard was:

"Q: What is it? Who did he want to see?

A: He wanted his daughter and his son to visit him.

Q: Well, they didn't want to go or didn't go, so you and Reggie decide you'd go visit?

A: She was in the hospital at the time. She was pregnant so she couldn't come. So we was there, we talked, we went up.

Q: Okay. Now, had you ever seen him before?

A: Last time I saw him I was about 12.

Q: So you hadn't seen this person for 10 years, and you decide one day you're going to go up and visit him, you and Reggie?

A: Yes.

Q: Okay. Drive all the way to Philadelphia?

A: Yes.

Q: Miss a day of work?

A: Yes.

Q: Miss wages for that whole day?

A: Yes."

Heightening this Faulkneresque carnival of improbabilities was that the two appellants, as they embarked for Philadelphia, did not know where Uncle Omar's prison was located. Their plan of attack was to go to the home in Philadelphia of Omar's mother (their great-aunt by marriage) and ask her how to find the prison. Why they did not simply ask their Aunt Helen where her husband's prison was located was not explained. When the appellants got to Philadelphia, Omar's mother was not at home and they decided to return to Baltimore.

Both appellants disclaimed ownership of the jacket, lying on the back seat of their car, that contained some $28,000 to $45,000 worth of contraband. They disclaimed, as well, any knowledge of the contraband. Their implicit explanation for how all that contraband got into their car may be found in their story about their fellow travelers that morning.

They both testified that as they were about to leave for Philadelphia, they ran across an acquaintance of theirs named William Dangerfield and a theretofore unknown companion of his named Sam. When informed of the appellants' destination, William Dangerfield and Sam asked to ride along to Philadelphia. The appellants agreed to take them. After the effort to locate Uncle Omar through Omar's mother came to naught, the appellants delivered William Dangerfield and Sam to another part of Philadelphia. After having asked the appellants to wait for him, William Dangerfield returned to their car 15 or 20 minutes later (Sam in the meantime having disappeared) and told them that he had decided to take a bus home from Philadelphia and that they could go on without him.

The implicit defense theory apparently was that William Dangerfield drove from Baltimore to Philadelphia carrying narcotics worth roughly $35,000 in his jacket and then inadvertently left the jacket in the car as he decided to stay

in Philadelphia. As was their prerogative, the jury did not buy this possibility and perhaps did not buy the very existence of William Dangerfield or Sam.

It yet remained for the appellants to explain away the rental car with the Virginia license tags. To this end, a day's measure of solicitude for Uncle Omar in Philadelphia paled beside a week's measure of solicitude for a friend of Darrell Wilkerson's father who had suffered the loss of a cousin in North Carolina.

Lewis Epps, the father of Darrell, apparently had no automobile of his own. Yet, when the cousin of a friend of his died in North Carolina, Lewis Epps was moved to rent a Chrysler New Yorker for the express purpose of driving his friend to the funeral in North Carolina. Why it would not have been cheaper to lend or give the friend the money to buy a bus ticket to North Carolina was not explained. Why the friend, even with the financial assistance of Lewis Epps, could not drive himself to North Carolina was not explained. What eventuated was that Lewis Epps not only rented the car but took off work for a week to chauffeur the friend to the funeral and that Darrell Wilkerson took off a week from work as well in order to help his father with the driving.

The threesome stayed in North Carolina for four days. Although the time of the rental was hidden in a fog bank of incoherent responses, there was a suggestion in the testimony that the initial two-week rental period was to have expired on September 15. Then, although it was apparently the friend who wanted to keep the car for a longer period, Lewis Epps apparently maintained sufficient control over the car to lend it to his son Darrell on approximately September 30. Lewis Epps was very confused about whether he loaned the son the car on the day (October 4) when his son drove to Philadelphia or when "we got back" (presumably from North Carolina in the early part of September).

In any event, with the meter presumably clicking away on a daily basis, the strangely lackadaisical agenda for returning the rental car was never rationally explained. The true explanation may have lurked in a possible Freudian slip by Lewis Epps:

"Q: Did you see your son on the day that he was arrested?

A: The day he was arrested?

Q: Um-hmm.

A: *That's the day that he rented the car.*

Q: The day what?

A: *That's the day he rented the car.* I mean I let him use the car." (emphasis supplied).

One other incident provided an evidentiary predicate for a permitted inference of guilty knowledge. After Trooper Conaway obtained the consent of Darrell Wilkerson for the search of the vehicle, he ordered both appellants out of the car. They were standing passively nearby as the search progressed. Trooper Conaway initially searched the front seat portion. It was as he moved toward the back seat of the vehicle that Darrell Wilkerson approached him and asked him if he wanted to look into the trunk:

"As I opened the back door to go into the back seat, Darrell reapproached me and asked me if I wanted to look in the trunk now. As he approached me, I also observed that he looked into the vehicle directly at that grayish brown jacket with the red liner."

Was this an act of solicitude for Trooper Conaway, reminding the trooper that the *Carroll* doctrine embraces the trunk as well as the passenger compartment, or was it a diversionary tactic? The resolution of such ambiguities is classic grist for the jury mill.

Once the various explanations of the appellants are stripped away as utterly disbelieved, as was the jury's prerogative, what remained was the strong probability that the automobile was engaged and the round trip to Philadelphia was undertaken for the sole and exclusive purpose of

buying a major quantity of narcotics and returning them to Baltimore for purposes of commercial sale. The very location of the intercept and the direction of the appellants' automobile is proof of transporting drugs into Maryland. The quantity and the level of purity of the drugs is proof of the intent to sell.

This was, moreover, no brief pedestrian stroll or vehicular accommodation in which one party might well have been unaware of what the other party was carrying. The evidence pointed to the reasonable likelihood that this trip was a joint venture all the way. That one party could have been totally innocent of the purpose of the trip, particularly while the hypothesized major buy was going on in Philadelphia, is extremely unlikely.

That version of the evidence most favorable to the State, and all reasonable inferences that can be drawn therefrom, could fairly have supported the verdicts of guilty. Judge Cole was, therefore, not in error in denying the motions and permitting the cases to go to the jury.

### The Consensual Search of the Automobile

#### A. Standing: A Non-Issue

The discussion of the Fourth Amendment merits at trial, on brief and in oral argument, has been intermittently interrupted by static on the subject of standing. It is nothing more than a passing distraction. Assuming, simply for the sake of argument, that both appellants are entitled to litigate the Fourth Amendment merits, they will nonetheless lose upon the merits and that's the easiest way to dispose of the question.

Standing is simply one aspect of the threshold question of Fourth Amendment applicability—the applicability of the constitutional protection to the person of the defendant. If that threshold question is answered in the negative, the Fourth Amendment merits are immaterial and are, therefore, not considered. If, on the other hand, the threshold question of applicability is answered in the affirmative, that

only determines that the defendant is thereby entitled to litigate the merits. Even assuming such entitlement in this case, the merits of the Fourth Amendment were satisfied because the police search of the automobile and of the container found therein was reasonable.

### B. *Semantics and Fashion*

■ "... the *container* found therein ..."? A word is in order, perhaps, about linguistic usage. The police only found the cocaine in this case when they searched a smaller thing inside a bigger thing. The bigger thing was an automobile. The smaller thing was to the eye of a layman, a gray *jacket,* lying on the back seat of the automobile. It was to the eye of a constitutional lawyer, however, using the algebraic terms appropriate for the problem, a *container.*

In *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the police were engaged, as they were here, in the warrantless search of the passenger compartment of an automobile.[2] There, they found, lying on the back seat, a black leather jacket. Here, they found, lying on the back seat, a grayish-brown jacket. There, as here, the jacket was searched. There, as here, the jacket contained incriminating cocaine. In *Belton,* what had been, descriptively, a "black leather jacket" then became, analytically, a "container":

> "It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment."

---

**2.** In that case, the search of the passenger compartment was pursuant to the theory of search incident to lawful arrest, whereas here the search of the entire automobile was pursuant to the consent theory. The distinction is immaterial, however, to the linguistic point that in the course of a search under any theory, an item of clothing capable of serving as a repository of evidence is placed, analytically, in the broader category of "container."

453 U.S. at 460, 101 S.Ct. at 2864. The Supreme Court supplied an express definition of the word "container" for Fourth Amendment purposes:

" 'Container' here denotes any object capable of holding another object. It thus includes closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, *clothing,* and the like." (emphasis supplied).

453 U.S. at 460 n. 4, 101 S.Ct. at 2864 n. 4.

From this point forward, therefore, we shall speak of the "container" that was on the back seat of the automobile and in which was found the cocaine.

## C. *Asking the Right Question*

█ In this case, the answer would be precisely the same whether we asked, "Did Darrell Wilkerson voluntarily consent to the search of the automobile and any container found therein?" or asked instead, "Did Trooper Conaway reasonably conclude that Darrell Wilkerson had so consented?" A proper understanding of consent law, however, makes it vitally important to know which of the two is the pertinent question.

Prior to the promulgation of *Illinois v. Rodriguez,* 497 U.S. ——, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), there was real debate within the academic community as to which, indeed, was the pertinent question. Some conceptualized a consensual search as an instance of the Fourth Amendment inapplicable rather than an instance of the Fourth Amendment satisfied. A Fourth Amendment protection, like any other constitutional guaranty, may be waived, provided only that the appropriate waiver standard be satisfied. Many had viewed consensual searches as instances of Fourth Amendment waiver, as cases of the protection being rendered inapplicable by the virtue of the voluntary consent of one authorized to give such consent. In that framework of analysis, consent was measured objectively from the vantage point of the hearing judge and on the basis of all

historic data available at the time of the hearing. Was valid consent actually given by one actually authorized to do so?

Others, however, conceptualized consent as a way of satisfying the Fourth Amendment merits, that is, as one of the recognized exceptions to the warrant requirement. To satisfy the warrant requirement or to satisfy any of its exceptions, of course, are ways of satisfying the Fourth Amendment commandment to be reasonable. In that framework of analysis, the issue of consent has to be viewed through the eyes of the policeman who conducts the search. What matters is not what the judge ultimately knows at the time of the hearing but rather what the policeman knew at the time of the search. The critical question is not whether voluntary consent had actually been given but only whether the policeman behaved reasonably in thinking it had.

*Illinois v. Rodriguez* resolved all doubt by holding that consent is an instance of Fourth Amendment satisfaction and that the reasonableness of police conduct is assessed on the basis of what the policeman perceived as of the time he searched. The issue, in *Rodriguez,* was squarely posed at ——, 110 S.Ct. at 2798, 111 L.Ed.2d at 157:

> "The State contends that, even if Fischer did not in fact have authority to give consent, it suffices to validate the entry that the law enforcement officers reasonably believed she did."

The Supreme Court was very clear as to what a citizen is guaranteed and what a citizen is not guaranteed, observing at ——, 110 S.Ct. at 2799, 111 L.Ed.2d 158:

> "What he is assured by the Fourth Amendment itself, however, is not that no government search of his house will occur unless he consents; but that no such search will occur that is 'unreasonable.' "

Justice Scalia was emphatic that consent is, indeed, not an instance of Fourth Amendment inapplicability or waiver but is rather an instance of Fourth Amendment satisfaction or reasonableness:

"[W]hat is at issue when a claim of apparent consent is raised is not whether the right to be free of searches has been *waived*, but whether the right to be free of *unreasonable* searches has been *violated*." (emphasis in original).

at ——, 110 S.Ct. at 2801, 111 L.Ed.2d at 161.

Under this framework of analysis, the fact of consent is simply another of a multitude of factual questions as to which the officer is required to come up with a reasonable answer but not necessarily the correct answer:

"We see no reason to depart from this general rule with respect to facts bearing upon the authority to consent to a search. Whether the basis for such authority exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably. The Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape."

at ——, 110 S.Ct. at 2800, 111 L.Ed.2d at 160.

What *Illinois v. Rodriguez* established in the context of third-party consent, *Florida v. Jimeno,* 500 U.S. ——, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991), routinely applied in the context of first-party consent:

"The Fourth Amendment is satisfied when, under the circumstances, it is objectively *reasonable for the officer to believe* that the scope of the suspect's consent permitted him to open a particular container within the automobile." (emphasis supplied).

■ The literal question, then, before the Court is not whether Darrell Wilkerson voluntarily consented to the search of the automobile and the container on the back seat

but only whether Trooper Conaway reasonably believed that he did.

### D. *Determining the Scope of a General Consent to Search*

■ At the suppression hearing, only Trooper Conaway testified. Neither defendant did. There is, therefore, no evidentiary support for Darrell Wilkerson's argument that at a certain point, he wanted to revoke the consent to search the car that he had earlier given but was somehow intimidated, by being asked to stand in the median strip, into thinking that he was not permitted to do so.

■ When Trooper Conaway stopped the speeding automobile, Darrell Wilkerson was behind the wheel. Darrell Wilkerson, moreover, had in his possession the rental papers for the automobile. Darrell Wilkerson was, therefore, clearly the pilot of the ship with authority to consent to its search or to withhold such consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Reginald Wilkerson never testified to any control over, ownership of, or possessory interest in anything.

Trooper Conaway asked Darrell Wilkerson for permission to search the automobile and received it. Darrell Wilkerson read, signed, and dated a "consent to search" form, which explicitly informed him of 1) his constitutional right to refuse to consent, 2) the fact that anything seized in the course of the search might be used against him, and 3) that he had the constitutional right to withdraw consent at any time. Trooper Conaway testified, and the form reflects, that no threats, promises, or inducements of any kind were made. Darrell Wilkerson never testified at all, let alone testified to the contrary. While the automobile search was in progress, Darrell Wilkerson reapproached Trooper Conaway and "asked [him] if [he] wanted to look in the trunk now," clearly implying that the consent was still operative.

The original consent was indisputably voluntary. More pertinently, Trooper Conaway reasonably perceived it to be.

Indeed, the only argument that Darrell Wilkerson now makes about the general consent to search the car is that, albeit having voluntarily given it in the first instance, he wanted to revoke it at a certain point but did not feel free to do so. He concluded that he was not free to do so simply because he and his cousin had been asked to stand in the median strip while the search was in progress. Since the median strip was the only proximate alternative to the heavily travelled fast lane, it would seem to us that to stand in it would have been less threatening than to stand in a fast lane of oncoming traffic. Whatever Darrell Wilkerson's rationale in this regard may have been, however, the short answer is that he never communicated his thoughts about revocation to anyone and certainly not to Trooper Conaway. It is, as we have said, Trooper Conaway's perception that counts. It was hardly unreasonable for Trooper Conaway not to have read Darrell Wilkerson's mind.

■ To Darrell Wilkerson, one argument yet remains. He maintains that no consent was ever given to the police to search the container (the jacket) lying on the back seat. He ignores both the law and the logic that even a general consent to search the automobile may implicitly embrace lesser, included consents. At the literal level, the consent form itself authorized not simply the general search of the vehicle but contained the specific *proviso,* "including but not limited to, any luggage/packages, its contents and to seize and take any letters, papers, materials or other property."

*Florida v. Jimeno* flatly contradicts the appellant's argument. There, the Miami police received a general consent to search the interior of an automobile. In the course of that search, they found a container (a brown paper bag) sitting on the floor of the front seat. They searched it warrantlessly and seized a large quantity of narcotics. The Supreme Court of Florida reversed the conviction, holding

that a general consent to search an automobile does not include a consent to search a container in that automobile. The Supreme Court of the United States reversed the Supreme Court of Florida.

In finding that a general consent to search an automobile may well include the consent to search containers in that automobile, the Supreme Court pointed out that the announced purpose of a search is a critical factor in determining the intended scope of an otherwise undifferentiated consent and, therefore, a critical factor in determining an officer's reasonable perception of that scope. In *Jimeno*, the police had announced that they wanted to search the automobile for drugs. That reasonably implied that they wanted to search all places and things within that automobile that could contain drugs.[3] Chief Justice Rehnquist reasoned in this regard, at 111 S.Ct. 1804:

"The scope of a search is generally defined by its expressed object.... In this case, the terms of the search's authorization were simple. Respondent granted Officer Trujillo permission to search his car, and did not place any explicit limitation on the scope of the search. Trujillo had informed respondent that he believed respondent was carrying narcotics, and that he would be looking for narcotics in the car. We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container. 'Contraband goods rarely are strewn across the trunk or floor of a car.' ... The authorization to search in this case, therefore, extended beyond the surfaces of the car's

---

3. Conversely, if the police asked for and received consent to search an automobile for fleeing fugitives, it would not be reasonable to conclude that that consent included consent to look in the glove compartment. The permitted scope of a search is, logically, whatever is necessary to serve the purpose of that particular search, but "Don't look for an elephant in a matchbox."

interior to the paper bag lying on the car's floor." (citations omitted).

In this case, as in *Jimeno,* Darrell Wilkerson knew that the police, in asking for consent, were looking, *inter alia,* for drugs. Trooper Conaway's testimony in this regard was:

"Q: Did you tell him why you were going to search the vehicle?

A: I told him we had a problem on the highways and with drugs and other guns and stolen property, something like that.

Q: And stolen property, too?

A: Right.

Q: And what did you tell him you were going to search for?

A: Those items and any contraband that's illegal in the State of Maryland."

Although a *Carroll* doctrine search of an automobile and a consensual search of an automobile proceed from different justifications, their objectives and the permitted scopes necessary to achieve those objectives are the same. As *United States v. Ross,* 456 U.S. 798, 820, 102 S.Ct. 2157, 2170, 72 L.Ed.2d 572, 590–591 (1982), pointed out:

"It is therefore significant that the practical consequences of the *Carroll* decision would be largely nullified if the permissible scope of a warrantless search of an automobile did not include containers and packages found inside the vehicle. Contraband goods rarely are strewn across the trunk or floor of a car; since by their very nature such goods must be withheld from public view, they rarely can be placed in an automobile unless they are enclosed within some form of container." (footnote omitted).

We hold that the search in this case was reasonable. Darrell Wilkerson had the apparent authority to consent to the search of the automobile and any container in it. In view of the stated purpose of searching for drugs, Trooper

Conaway reasonably concluded that the general consent to search the car included consent to search the container found on the back seat. We conclude as did *Florida v. Jimeno,* at 111 S.Ct. 1804:

"[I]f his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization."

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANTS.