693 A.2d 781

**Clarence CONYERS, Jr.**

**v.**

**STATE of Maryland.**

**No. 39, Sept.Term, 1996.**

Court of Appeals of Maryland.

May 8, 1997.

528

530

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender; Margaret L. Lanier, Asst. Public Defender, on brief), Baltimore, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen., (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

CHASANOW, Judge.

This direct appeal comes to us pursuant to Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 414(a). Appellant, Clarence Conyers, Jr., was adjudicated guilty in the Circuit Court for Wicomico County of premeditated murder, felony murder, first-degree burglary, robbery with a deadly weapon, attempted robbery with a deadly weapon, robbery, attempted robbery, and use of a handgun in the commission of a crime of violence with respect to Wanda Johnson. He was also convicted of premeditated murder and use of a handgun in the commission of a crime of violence with respect to Lawrence Bradshaw. Appellant was sentenced to death for the murder of Ms. Johnson and to life without the possibility of parole for the murder of Mr. Bradshaw. Appellant presents ten issues for review, and he asks this Court to grant him a new trial or, in the alternative, a new sentencing hearing.

I.

At approximately 9:35 p.m. on Friday, October 21, 1994, Appellant's estranged girlfriend, Monica Wilson, went to visit her mother, Wanda Johnson, at the home Ms. Johnson shared with her husband, Elwood Johnson. Ms. Wilson had just spoken with her mother at 9:00 p.m. that evening, and her mother had agreed to babysit for Ms. Wilson's son. Arriving with Ms. Wilson at the Johnson home was her cousin, Carla Clinton.

As the two women approached the Johnson home, they saw someone looking outside through a second floor bedroom window. The women knocked on the door, and, as they waited for someone to open it, they saw through a window a man walking down the stairs. The women saw this man turn

off the lights inside the house and duck down as if to avoid being seen. The two women walked to a back door and knocked on it. The women heard sounds of a struggle, described as "a commotion," "tussling" and "fighting," coming from inside the house. Then Ms. Johnson began to scream, and a window on the second floor broke over the women's heads.

The two women fled to the home of a relative who lived nearby and called the police. On the way to the relative's house, Ms. Wilson noticed a car parked across the street from her mother's house. The car resembled one that Appellant sometimes borrowed from his former girlfriend and mother of his child, Debra Meyers. Upon returning to the Johnson home, Ms. Wilson was informed by the police that her mother was dead.

There were no signs of forced entry into the Johnson home. Wanda Johnson's body was found in the master bedroom. She had been shot three times in the head, once in the back, and once in the arm. It was Ms. Johnson's custom to keep a small amount of money in her wallet. Furthermore, when Ms. Wilson spoke to Ms. Johnson earlier that evening, at approximately 9:00 p.m., Ms. Johnson said that she had twenty dollars. Ms. Johnson's open wallet was found atop her dresser in the master bedroom; there was no money in the wallet.

In the den, a door to a closet had been forced open, revealing a safe. The closet door had a hasp and a lock on it for security, but the hasp and lock had been pried out of the door jamb to gain access to the closet. Pulling the hasp out of the door jamb had caused splinters to fall on the floor around the closet. The safe inside the closet was closed. Mr. Johnson opened the safe the day after his wife's murder; it contained fifteen dollars.

The next day, Ms. Clinton worked with a police artist on a sketch of the man she had seen on the staircase inside the Johnson home the evening before. Ms. Wilson was asked to look at the sketch that had been made based on Ms. Clinton's description. Appellant, who had come to the police station to

keep Ms. Wilson company, took the sketch away before Ms. Wilson had a chance to see it, telling the police that the sketch would upset her. When Ms. Wilson finally had a chance to see the police sketch, she did not immediately identify Lawrence Bradshaw as the man depicted in the sketch. She made a photo identification of another man, who was arrested and incarcerated for a brief time as a result. Ms. Wilson later agreed, however, that the police sketch looked like Lawrence Bradshaw.

Shortly after 1:00 a.m. on October 23, 1994, approximately 27 hours after the murder of Ms. Johnson, Lawrence Bradshaw was shot in the 4300 block of McDowell Lane. This street is located in the Lansdowne area, near Debra Meyers's home. Mr. Bradshaw had been shot three times in the head, once in the back, once in the arm, and once in the finger. Mr. Bradshaw was taken to Shock Trauma, where he died the following day.

Appellant was charged with both the Johnson and the Bradshaw murders. With regard to Ms. Johnson, Appellant was charged with premeditated murder, felony murder, first-degree burglary, robbery with a deadly weapon, attempted robbery with a deadly weapon, robbery, attempted robbery, and use of a handgun in the commission of a crime of violence. With regard to Mr. Bradshaw, Appellant was charged with premeditated murder and use of a handgun in the commission of a crime of violence.

At trial, Ms. Wilson testified that she and Appellant had been romantically involved for approximately two years and that they had lived together from February 1994 until October 1994. She moved out of the house in October of 1994 because her relationship with Appellant had become "real violent." She returned to the home she had shared with Appellant frequently, however, and she often saw Bradshaw there.

Ms. Wilson explained that Appellant was a frequent and welcome guest in the home of Wanda and Elwood Johnson. She testified that she told Appellant about the safe in the Johnsons' upstairs closet. Appellant also knew that Ms. John-

son was usually out of the house on Friday evenings. Ms. Wilson testified that her mother often spent entire weekends babysitting for Keion, Ms. Wilson's son. At some time before her murder, however, Ms. Johnson's routine changed, and she was no longer able to babysit for Keion on the weekends. Ms. Wilson testified that she often complained to Appellant that because of Ms. Johnson's new routine, Ms. Wilson did not have a weekend babysitter.

Ms. Wilson testified that she spent the night of her mother's murder at the apartment she used to share with Appellant; that sometime during the next day, Lawrence Bradshaw called the apartment to speak to Appellant, who was not at home; and that when Ms. Wilson gave Appellant the message that Mr. Bradshaw had called, Appellant became angry, and he said: "[H]ow the F did he get my phone number[?] What is he doing calling here? I don't know why he would call here." Ms. Wilson also testified that the day after the murder, October 22, Appellant would change the television channel whenever the news of Ms. Johnson's murder was being broadcast.

Wanda Johnson and Lawrence Bradshaw were both shot with a .38 caliber handgun. Ms. Wilson testified that Appellant owned two .38 caliber handguns and that she had seen and held one of those handguns when she lived with Appellant. Ms. Wilson explained that Appellant occasionally stored that handgun in a Charlie Rudo bag. Ms. Wilson never saw the second gun, but she was told about it by Appellant while he was incarcerated for the Johnson and Bradshaw murders.

Debra Meyers testified that on the evening of October 21, the night of Ms. Johnson's murder, Appellant came to Ms. Meyers's house between 10:00 and 11:00 p.m., shortly after the time of the murder, and asked to leave a Charlie Rudo bag at her house. Ms. Meyers agreed. She returned the bag to Appellant the following day, October 22, at his request. The State theorized that the bag contained the gun that had been used to commit one or both of the murders, but, after being given a gun to hold at trial, Ms. Meyers testified that the bag

she held for Appellant did not weigh enough to contain a gun and that, when dropped, the bag did not sound as if it contained a gun.

Ms. Meyers also testified that in the early hours of October 23, shortly before Mr. Bradshaw was killed, Appellant and Mr. Bradshaw, whom Appellant introduced as "Molek," arrived at Ms. Meyers's house, 4236 Twin Circle Way, and stayed for twenty minutes. A short time after the two men left Ms. Meyers's house, she heard gunshots. Appellant returned to Ms. Meyers's house, alone, after the gunshots were fired, and left a few minutes later. One witness, who lived at 4245 Twin Circle Way, testified that she saw someone running down the street and into a neighbor's house shortly after hearing gunshots at approximately 1:15 a.m. The witness knew only that the neighbor's first name was Debbie.

One of the policemen who arrived at the scene of the Bradshaw murder, David Kruger, was a member of the K–9 unit. After ensuring that the crime scene had not been contaminated, he followed his canine partner, Hero, who had picked up a scent, from the crime scene to Debra Meyers's home.

Charles Johnson, who is not related to the murder victim, Wanda Johnson, was Appellant's cellmate for approximately one month in 1994. Charles Johnson testified that, while they shared a cell, Appellant had confessed to committing the two murders. Charles Johnson seemed to know many of the details of the killings, including details that had not been released to the media and that could not have been learned by reading Appellant's papers in their shared jail cell. According to Charles Johnson, Appellant stated that he had borrowed his daughter's mother's car to go with Bradshaw to Wanda Johnson's home to rob a safe that was kept in the closet. While the men were upstairs, they heard a knock at the door, and Bradshaw went downstairs to be sure that no one could get into the house. Bradshaw walked down the stairs, turned out the lights and ducked down to avoid being seen. Appellant then heard Ms. Wilson at the back window. When Ms.

Johnson called out her daughter's name, Appellant panicked and shot Ms. Johnson in the head, behind the right ear. Bradshaw left the scene immediately, but Appellant waited until Ms. Wilson left. Appellant later shot Bradshaw because he was a witness to the robbery and shooting of Wanda Johnson. Cellmate Johnson knew that Bradshaw had been shot three times and that he had been shot near some woods.

Appellant's parents and two sisters testified that Appellant had been with them before and during the time Wanda Johnson was killed, but in earlier statements made to the police, one sister stated that she had seen Appellant only briefly on the night of Ms. Johnson's murder, and the other sister stated that she did not see Appellant until he had returned from the police station that night.

The jury convicted Appellant on all counts and sentenced him to death for the murder of Wanda Johnson. Appellant was sentenced to life imprisonment without the possibility of parole for the murder of Lawrence Bradshaw. The remaining counts were resolved by merger or received lesser sentences.

Additional facts relevant to the disposition of this appeal will be provided as needed.

## II.

The first issue is whether the trial court erred when it refused to admit a statement, attributed to Appellant, that someone other than Appellant was in possession of his guns on the night of Ms. Johnson's murder. Appellant contends that the statement should have been admitted under the doctrine of verbal completeness.

During the State's examination of Monica Wilson, she testified that Appellant owned two .38 caliber handguns. Ms. Wilson testified that she had seen and held one of the guns while she and Appellant lived together, and that she learned that Appellant owned a second gun during a telephone conversation they had shortly after Appellant was incarcerated for Ms. Johnson's murder. Ms. Wilson also testified that Appellant sometimes stored one of his guns in the Charlie Rudo bag

that was introduced as State's Exhibit 24. This testimony tended to support the State's theory that Appellant hid a gun at Debbie Meyers's house on the evening of Ms. Johnson's murder.

During cross-examination, Appellant attempted to elicit testimony from Ms. Wilson concerning another conversation she had had with Appellant while he was incarcerated; the substance of that conversation was that Appellant had given his guns to Mr. Bradshaw sometime before the two murders occurred:

> "Q. With reference to the two guns, ma'am, you had indicated you were aware that Clarence Conyers had owned two guns during the time you lived with him, am I correct?
>
> A. Yes.
>
> Q. And you had a conversation at some point with him as to where those guns were, is that correct?
>
> A. I had a conversation with him ... stating that he had two guns, not where they were, that he had two guns.
>
> Q. Did there ever come a time where you discussed with him where are those guns and specifically where were they on the night that your mother was killed?
>
> A. Yes.
>
> Q. And did he not tell you—"

At this point the State objected on the ground that the statement about to be produced was hearsay. Appellant argued that, under the doctrine of verbal completeness, the court was required to admit this exculpatory hearsay statement to balance the effect of the inculpatory hearsay statements elicited during Ms. Wilson's direct examination.

■ Maryland's doctrine of verbal completeness is partially codified, at least as to timing, in Maryland Rule 5–106, which reads:

> "When part or all of a writing or recorded statement is introduced by a party, an adverse party may require the introduction at that time of any other part or any other

writing or recorded statement which ought in fairness to be considered contemporaneously with it."

This rule allows certain writings or recorded statements to be admitted earlier in the proceedings than the common law doctrine of completeness. *See* Md.Rule 5–106, Committee Note. Maryland Rule 5–106 does not change the requirements for admissibility under the common law doctrine or allow the admission of otherwise inadmissible evidence, "except to the extent that it is necessary, in fairness, to explain what the opposing party has elicited." *Id.* In such a circumstance, the evidence is offered merely as an explanation of previously-admitted evidence and not as substantive proof. *Id.* In the present case, Ms. Wilson's statement concerning the location of Appellant's guns on the night of the Johnson murder was not offered by Appellant contemporaneously with Ms. Wilson's statement, admitted by the State, that Appellant owned two guns. Thus, the issue is not one of timing, and Md. Rule 5–106 is not applicable.

The issue of primary concern in the present case is the admissibility of Ms. Wilson's second statement under the common law doctrine of completeness. The doctrine allows a party to respond to the admission, by an opponent, of part of a writing or conversation, by admitting the remainder of that writing or conversation. *Richardson v. State,* 324 Md. 611, 598 A.2d 180 (1991). The requirements of the doctrine of completeness were first set forth by this Court in *Feigley v. Balto. Transit Co.:*

> " ' "This right of the opponent to put in the remainder is universally conceded, for every kind of utterance without distinction; and the only question can be as to the scope and limits of the right.
>
> * * * In the definition of the limits of this right, there may be noted three general corollaries of the principle on which the right rests, namely:
>
> (a) No utterance irrelevant to the issue is receivable;

(b) No more of the remainder of the utterance than concerns the same subject, and is explanatory of the first part, is receivable;

(c) The remainder thus received merely aids in the construction of the utterance as a whole, and is not in itself testimony." ' " (Emphasis omitted).

211 Md. 1, 10, 124 A.2d 822, 827 (1956)(quoting 7 Wigmore, EVIDENCE, § 2113 (1940)). The doctrine is further limited in that the remainder of a writing or conversation sought to be introduced must not be irrelevant and should be excluded if "the danger of prejudice outweighs the explanatory value." *Richardson*, 324 Md. at 622–23, 598 A.2d at 185 (quoting MCCORMICK ON EVIDENCE, § 56 (E. Cleary ed., 3d ed. 1984)).

Neither party has cited, nor have we found, a case in this Court or in the Court of Special Appeals that has, under the doctrine of completeness or Md.Rule 5–106, admitted a writing or statement that was not the remaining part of a single writing or conversation. In an appropriate circumstance, however, the doctrine would permit the admission of a *separate writing or conversation* to place in context a previously-admitted writing or conversation.

An example of such a case is *State v. Baca*, 120 N.M. 383, 902 P.2d 65 (1995). In that case, Baca appealed his convictions for the murder of his wife, Geraldine, and the attempted murder of his daughter, Renee. *Baca*, 902 P.2d at 67–68. At trial, the State introduced into evidence Renee's statement, made during a therapy session with social worker David Breault, that she was afraid of dogs because she was bitten by a dog in the house where "they killed me." *Baca*, 902 P.2d at 69. The use of the word "they" tended to bolster the State's theory that two men, Baca and Sergio Flores, a friend of the Baca family, killed Geraldine and attempted to kill Renee. *Baca*, 902 P.2d at 68–69.

Baca objected to the admission of the statement made during the Breault therapy session as hearsay, and, in the alternative, asked to introduce contemporaneously a video tape of Renee's later therapy session with therapist Judith

Fuhrer. *Baca,* 902 P.2d at 69. In that session, Renee used the phrase "they killed me" several times, but each time Renee was asked who "they" were, she answered "Huero." *Id.* "Huero" was Flores's nickname. *Baca,* 902 P.2d at 68. Baca argued that, under the rule of completeness, the second statement should be admitted into evidence to explain or place into context the evidence admitted by the State, although it derived from a separate conversation. *See Baca,* 902 P.2d at 72. The trial court excluded the evidence as inadmissible hearsay. *Baca,* 902 P.2d at 69.

The Supreme Court of New Mexico conceded that whether the second statement was admissible may have been moot because the first statement was erroneously admitted, either because it was hearsay not falling within any exception or because it was unfairly prejudicial. *See Baca,* 902 P.2d at 70–72. Nevertheless, the court discussed the admission of the second statement under the rule of completeness "because it illustrate[d] one of the many errors that occurred and deprived Baca of a fair trial." *Id.*

New Mexico's rule of completeness, like Maryland's, allows courts to admit any writing or recorded statement that should, in fairness, be considered contemporaneously with a writing or statement previously introduced by another party. *See Baca,* 902 P.2d at 72 (citing SCRA 11–106). In *Baca,* the Supreme Court of New Mexico explained that "Renee's statement, when viewed alone, was misleading because when Renee said 'they' she meant 'Huero.'" *Id.* The court held that the video tape should have been admitted to place in context Renee's use of the word "they" in her first statement. *Id.*

In the present case, the State's witness, Ms. Wilson, testified that Appellant owned two .38 caliber handguns. On cross-examination, Appellant wished to have Ms. Wilson testify that she had been told by Appellant that he had given his guns to Mr. Bradshaw sometime before Ms. Johnson's murder. We hold that the trial judge did not abuse his discretion by refusing to admit the separate hearsay statement under the doctrine of verbal completeness.

The State questioned Ms. Wilson about a conversation she had with Appellant shortly after he was incarcerated. It is clear from the testimony reproduced above that, during this conversation, all Ms. Wilson and Appellant discussed was "that he had two guns, not where they were. . . ." Appellant may have been entitled to have Ms. Wilson testify about other parts of that same conversation under the doctrine of verbal completeness. *See Richardson*, 324 Md. at 622, 598 A.2d at 185; *Bowers v. State*, 298 Md. 115, 133, 468 A.2d 101, 110–11 (1983). Appellant acknowledges that the statement that Appellant sought to elicit took place during a different conversation between himself and Ms. Wilson. The doctrine of completeness allows, and under some circumstances fairness may require, a court to admit statements from separate conversations. This is not a case like *Baca*, however, where the jury clearly could have been misled by the first statement if not also allowed to consider the second, and we cannot hold that the trial judge abused his discretion in refusing to admit Appellant's second statement concerning the weapons.

 Even if the two statements had been part of a single conversation, Ms. Wilson's testimony may have been less likely to be admitted under the doctrine of verbal completeness because, if offered by appellee, the statement would be an admission, but if offered by appellant, it would be inadmissible hearsay. Hearsay has been defined as "a statement, other than one made by the declarant while testifying at the trial . . ., offered in evidence to prove the truth of the matter asserted." *Graves v. State*, 334 Md. 30, 36 n. 2, 637 A.2d 1197, 1201 n. 2 (1994). The statement Appellant made to Ms. Wilson was offered by the State as an admission. Md. Rule 5–803(a)(1). In Maryland, a statement by a party that is offered against that party is a hearsay exception. *Id.* By contrast, when Appellant tried to introduce his own statements, they were hearsay.

"An admission . . . may be admitted into evidence at trial when offered *against* the declarant. The same statement, however, is not admissible if it is offered *for* the declarant.

Such statements are inherently suspect as being self-serving." (Citation omitted). (Emphasis in original).

*Muir v. State,* 64 Md.App. 648, 656, 498 A.2d 666, 670 (1985), *aff'd on other grounds,* 308 Md. 208, 517 A.2d 1105 (1986). The doctrine of verbal completeness does not allow evidence that is otherwise inadmissible as hearsay to become admissible solely because it is derived from a single writing or conversation. *See* McCormick on Evidence, § 56 (John W. Strong ed., 4th ed. 1991).

This, however, does not absolutely preclude Appellant from arguing that the proffered evidence was admissible under the doctrines of "curative admissibility" and "opening the door." The applicability of these two doctrines was never clearly articulated at trial, but even if they had been, neither doctrine would have allowed Appellant to introduce Ms. Wilson's second statement into evidence. Each doctrine is applicable only in limited and well-defined circumstances to combat a particular inequity.

"Opening the door" and "curative admissibility" are two doctrines that, in limited circumstances, give a party the right to introduce otherwise inadmissible evidence. This Court highlighted the distinction between the doctrines in *Clark v. State,* 332 Md. 77, 629 A.2d 1239 (1993). The doctrine of "opening the door" gives a party " 'the right to introduce evidence in response to (a) admissible evidence, or (b) inadmissible evidence admitted over objection. . . .' " *Clark,* 332 Md. at 84, 629 A.2d at 1242 (quoting Joseph F. Murphy, Jr., Maryland Evidence Handbook § 106(D), at 25 (1989)). "Opening the door" is a rule of expanded relevancy; it allows the admission of evidence that is competent, but otherwise irrelevant, in order to respond to evidence introduced by the opposing party during its direct examination. *Clark,* 332 Md. at 84–85, 629 A.2d at 1242–43. Whether the opponent's evidence was admissible evidence that injected an issue into the case or inadmissible evidence that the court admitted over objection, once the "door has been opened" a party must, in fairness, be allowed to respond to that evidence. *Clark,* 332

Md. at 85, 629 A.2d at 1243. In other words, the doctrine makes relevant what was irrelevant before opposing counsel's direct examination. *Id.* ("Generally, 'opening the door' is simply a contention that *competent* evidence which was previously irrelevant is now relevant through the opponent's admission of other evidence on the same issue.")(emphasis added).

In this case, the State was able to put into evidence, during the direct examination of Ms. Wilson, the fact that Appellant owned two .38 caliber handguns. The evidence that Appellant wished to elicit in response during cross-examination, that he told Ms. Wilson he had given the guns to Mr. Bradshaw before Ms. Johnson's murder, was hearsay. This testimony was indeed inadmissible, but not because it was irrelevant; the testimony was inadmissible because it was incompetent. The "opening the door" doctrine does not permit the admission of incompetent evidence. *Clark,* 332 Md. at 87, 629 A.2d at 1244.

The "curative admissibility" doctrine, on the other hand, "in rare instances allows otherwise irrelevant and incompetent evidence to repair the damage caused by previously admitted [highly prejudicial] incompetent inadmissible evidence." *Clark,* 332 Md. at 88, 629 A.2d at 1244. This doctrine allows a party to admit evidence to respond to " 'inadmissible evidence admitted without objection.' " *Clark,* 332 Md. at 84, 629 A.2d at 1242 (quoting JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 106(D), at 25 (1989)). Appellant's incompetent inadmissible evidence could not be admitted under this doctrine, however, because the evidence was offered in response to State's evidence that was competent and admissible.

### III.

The second issue Appellant raises is whether the trial court erred in denying his motion to sever the counts of the indictment and to obtain separate trials for the Johnson murder and the Bradshaw murder. There has been some confusion regarding the law of trial joinder and severance in Maryland, as

was illustrated by the briefs and oral arguments of counsel in this case. We wish to clarify the law in this area before applying the law to Appellant. In doing so we borrow heavily from Judge Moylan's in-depth analysis in *Solomon v. State,* 101 Md.App. 331, 646 A.2d 1064 (1994).

### A.

██ Two related problems fall under the heading of trial joinder and severance: when to try multiple defendants in a single trial ("joinder of defendants"), and when to try one defendant on multiple charges in one trial ("joinder of offenses"). *See* Md.Rule 4–253. Maryland's Rule on "Joint or Separate Trials" states:

"**(a) Joint Trial of Defendants.**—On motion of a party, the court may order a joint trial for two or more defendants charged in separate charging documents if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.

**(b) Joint Trial of Offenses.**—If a defendant has been charged in two or more charging documents, either party may move for a joint trial of the charges. In ruling on the motion, the court may inquire into the ability of either party to proceed at a joint trial.

**(c) Prejudicial Joinder.**—If it appears that any party will be prejudiced by the joinder for trial of counts, charging documents, or defendants, the court may, on its own initiative or on motion of any party, order separate trials of counts, charging documents, or defendants, or grant any other relief as justice requires."

*Id.* The present case involves subsection (b), the single trial of one defendant, Conyers, for two separate offenses: the first-degree murder of Ms. Johnson and the first-degree murder of Mr. Bradshaw.

The watershed case concerning trial joinder is *McKnight v. State,* 280 Md. 604, 375 A.2d 551 (1977). *McKnight* interpreted Md.Rule 745, the precursor to Md.Rule 4–253. 280 Md. at

607, 375 A.2d at 553–54. The cases that preceded *McKnight* regarded questions of trial joinder as the province of the trial judge, who enjoyed broad discretion. *Solomon*, 101 Md.App. at 340, 646 A.2d at 1068. *McKnight* was a watershed case because it identified, for the first time, a limit on trial judges' discretion to decide issues of joinder and severance. *Id.*

In *McKnight*, a single defendant charged with multiple robberies that occurred over a period of one month sought to have the counts of the indictment severed so that he could have a separate trial on each charge. 280 Md. at 605–06, 375 A.2d at 552. The trial judge denied McKnight's motion for severance, and a single jury trial was held on four criminal informations, each of which contained eight charges. *McKnight*, 280 Md. at 606–07, 375 A.2d at 553. McKnight was convicted on at least one of the charges contained in each of the four counts, and he appealed. *See McKnight*, 280 Md. at 607, 375 A.2d at 553. This Court reversed the decision of the Court of Special Appeals, which had affirmed McKnight's convictions. *McKnight*, 280 Md. at 616, 375 A.2d at 558.

We explained that joinder of offenses, traditionally, has been justified on the basis that "a single trial effects an economy, by saving time and money, to the prosecution, the defendant, and the criminal justice system." *McKnight*, 280 Md. at 608–09, 375 A.2d at 554. There is a risk, however, that joinder of offenses may be prejudicial to the defendant. *McKnight*, 280 Md. at 609, 375 A.2d at 554.

"First, he may become embarrassed, or confounded in presenting separate defenses. Secondly, the jury may cumulate the evidence of the various crimes charged and find guilt when, if the offenses were considered separately, it would not do so. At the very least, the joinder of multiple charges may produce a latent hostility, which by itself may cause prejudice to the defendant's case. Thirdly, the jury may use the evidence of one of the crimes charged, or a connected group of them, to infer a criminal disposition on the part of the defendant from which he may also be found guilty of other crimes charged."

*McKnight,* 280 Md. at 609, 375 A.2d at 554–55. It was the third example of prejudice that this Court was most concerned with in *McKnight.* 280 Md. at 609, 375 A.2d at 555. We, therefore, explained how a judge could avoid such prejudice and ensure that the jury would not "infer a criminal disposition on the part of the defendant." It was in providing this explanation that the confusion regarding the law of trial joinder began.

We explained that if a judge could determine that the evidence of any two or more offenses would be mutually admissible, that is, "evidence of one crime would be admissible at a separate trial on another charge," then joinder of those offenses would be permissible because the defendant would not suffer any *additional* prejudice as a result of the joinder. *McKnight,* 280 Md. at 610, 375 A.2d at 555. Thus, mutual admissibility became the precondition for similar offense joinder. *Solomon,* 101 Md.App. at 341, 646 A.2d at 1069.

The analysis of mutual admissibility is made by answering a hypothetical question: Would evidence of each charge be admissible in a separate trial of each other charge? This hypothetical question, in *McKnight,* was actually twelve separate questions, because mutual admissibility in four criminal events involves several assessments of one-directional admissibility.[1] *See Solomon,* 101 Md.App. at 341, 646 A.2d at 1069. One-directional admissibility is another name for the common evidentiary determination of admissibility that is made many times in every trial.

Whether evidence of one offense would be admissible in a trial on another offense concerns, by definition, "other crimes" evidence. *Solomon,* 101 Md.App. at 341–42, 646 A.2d at 1069. "Other crimes" evidence is "evidence that relates to an offense

---

1. The number of analyses of mutual admissibility can be expressed by the formula $(n \times (n-1))$. When there are two offenses, A and B, there will be only two analyses of admissibility $(2 \times 1 = 2)$, whether A is admissible in B(AB) and whether B is admissible in A(BA). When there are three offenses, A, B, and C, there will be six analyses of admissibility $(3 \times 2 = 6)$ AB; AC; BA; BC; CA; and CB. In *McKnight v. State,* 280 Md. 604, 375 A.2d 551 (1977), we assume that the Court made twelve analyses of admissibility $(4 \times 3 = 12)$.

separate from that for which the defendant is presently on trial." *State v. Faulkner,* 314 Md. 630, 634, 552 A.2d 896, 898 (1989). In *McKnight,* we quoted *Ross v. State,* 276 Md. 664, 350 A.2d 680 (1976), to explain the "other crimes" rule. 280 Md. at 612, 375 A.2d at 556. In *Ross* we said:

> "The frequently enunciated general rule in this state ... is that in a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same type, is irrelevant and inadmissible. This principle is merely an application of the policy rule prohibiting the initial introduction by the prosecution of evidence of bad character. Thus, the state may not present evidence of other criminal acts of the accused unless the evidence is 'substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character.'" (Citations omitted).

276 Md. at 669, 350 A.2d at 684 (quoting McCORMICK ON EVIDENCE, § 190 (E. Cleary ed., 2d ed. 1972)). Some of the "other purposes" for which "other crimes" evidence may be admitted were discussed in *Solomon,* 101 Md.App. at 353–55, 646 A.2d at 1075–76, but the Court of Special Appeals was careful to point out that the list contained therein is not finite. *Solomon,* 101 Md.App. at 355, 646 A.2d at 1075–76 (quoting *State v. Edison,* 318 Md. 541, 547, 569 A.2d 657, 660 (1990), and *Harris v. State,* 324 Md. 490, 501, 597 A.2d 956, 962 (1991)).

The definitive opinion regarding the admission of "other crimes" evidence is *Faulkner, supra. Faulkner* created a test, consisting of three procedural steps, that a judge must apply before he or she may admit "other crimes" evidence. 314 Md. at 634–35, 552 A.2d at 898. The first step is to determine whether the evidence is *prima facie* admissible because it fits within any exception to the presumptive rule of exclusion, *Faulkner,* 314 Md. at 634, 552 A.2d at 898, such as the exceptions discussed in *Solomon.* The second step is to determine "whether the accused's involvement in the other

crimes is established by clear and convincing evidence." *Id.* Finally, the judge must weigh "[t]he necessity for and probative value of the 'other crimes' evidence ... against any undue prejudice likely to result from its admission." *Faulkner*, 314 Md. at 635, 552 A.2d at 898.

 Whether evidence that the defendant was involved in "other crimes" is admissible is an evidentiary question that can arise anytime during a trial. *Solomon*, 101 Md.App. at 336, 646 A.2d at 1066. Whether to permit joinder in the interest of judicial economy, in contrast, is a procedural question that must be resolved during a pre-trial hearing. *Id.* In a joinder analysis, a court need only consider the first step of *Faulkner* to determine mutual admissibility. If the evidence fits within one of the exceptions to the presumptive rule of exclusion, then mutual admissibility exists.

Step two of the *Faulkner* test would be of little benefit at a pre-trial joinder hearing. A court's determination that the accused was involved in "other crimes" by clear and convincing evidence serves an important evidentiary function during a trial. *Solomon*, 101 Md.App. at 343, 646 A.2d at 1070. It allows the court to examine the reliability of the "other crimes" evidence before it has a chance to influence the jury. *Id.* In a pre-trial joinder hearing, however, "[a]ll crimes charged, and, therefore, amenable to the possible joinder, are the considered products of grand jury indictments or criminal informations." *Id.* Additionally, during the trial of a single charge,

> "there is a clearly identifiable criminal charge that is the centerpiece of the trial and the so-called 'other crime' is merely a peripheral incident, perhaps never to be received in evidence in that or any other trial. In the joinder/severance situation, by contrast, all the criminal charges involved are of equal stature. In the joinder context, who is to say which is the base crime and which is merely the 'other crime?' "

*Solomon*, 101 Md.App. at 344, 646 A.2d at 1070.

Similarly, the balancing test required by *Faulkner* would be a three way balance in a pre-trial joinder hearing, where a

concern to be weighed is judicial economy. The purpose of joining offenses or defendants in a single trial is to save time and money by avoiding additional trials. *Stevenson v. State*, 43 Md.App. 120, 130, 403 A.2d 812, 818 (1979)(interpreting Md. Rule 745, the precursor to Md. Rule 4–253), *aff'd on other grounds*, 287 Md. 504, 413 A.2d 1340 (1980). Judicial economy is not implicated, however, when deciding the evidentiary question of whether to admit "other crimes" evidence. "Receiving 'other crimes' evidence does not conserve precious judicial resources; neither does rejecting such evidence squander those resources. The rejection of ['other crimes'] evidence at the trial in question will not entail an additional trial." *Solomon*, 101 Md.App. at 346, 646 A.2d at 1071.

This Court made its own analysis of the mutual admissibility of the four offenses charged in *McKnight*, using the first step of the *Faulkner* test, and we concluded "that the evidence produced .·.. to prove appellant's guilt under each of the four charges would not have been mutually admissible at separate trials for the same offenses." *McKnight*, 280 Md. at 614, 375 A.2d at 557. We held that, under such circumstances, it was error for the trial judge to deny McKnight's motion to sever: "We think that a defendant charged with similar but unrelated offenses is entitled to a severance where he establishes that the evidence as to each individual offense would not be mutually admissible at separate trials." *McKnight*, 280 Md. at 612, 375 A.2d at 556.

*McKnight*'s holding, technically, did not apply to multiple defendant joinder, but this Court has stated that the *McKnight* analysis is also the proper way to determine the propriety of multiple defendant joinder. *Osburn v. State*, 301 Md. 250, 482 A.2d 905 (1984). It should also be noted that *McKnight* dealt with the law of joinder and severance in a jury trial. The law of trial joinder in bench trials is more flexible. A judge has the discretion to permit joinder of offenses or defendants even if there is no mutual admissibility of offenses because it may be presumed that a judge will not

transfer evidence of guilt as to one offense to another offense. *Graves v. State,* 298 Md. 542, 546–47, 471 A.2d 701, 703 (1984).

 *McKnight* created the connection between "other crimes" evidence and joinder that may have caused some confusion ever since. In order to reach its holding, that McKnight's offenses should have been severed, this Court made its own determination of mutual admissibility. The steps of the analysis, however, were not clearly set forth, and the elements of two distinct theories have since been co-mingled and sometimes misapplied. In sum, the analysis of jury trial joinder issues may be reduced to a test that encompasses two questions: (1) is evidence concerning the offenses or defendants mutually admissible; and (2) does the interest in judicial economy outweigh any other arguments favoring severance? If the answer to both questions is yes, then joinder of offenses or defendants is appropriate. In order to resolve question number one, a court must apply the first step of the "other crimes" analysis announced in *Faulkner.* If question number one is answered in the negative, then there is no need to address question number two; *McKnight* mandates severance as a matter of law.

### B.

 This Court must determine whether the trial judge properly joined two offenses for trial. As previously mentioned, the present case involves the single trial of Appellant, Conyers, on two separate charges: the first-degree murder of Ms. Johnson and the first-degree murder of Mr. Bradshaw. Because Appellant was to be tried before a jury, an analysis of the mutual admissibility of the offenses was required. The judge made such an analysis, and he concluded that the commission of the Johnson murder would be admissible in a trial for the Bradshaw murder and that the commission of the Bradshaw murder would be admissible in a trial for the Johnson murder. The judge's finding on this point was a legal determination. *Solomon,* 101 Md.App. at 338, 646 A.2d at 1067.

With respect to mutual admissibility, the first step of the joinder analysis, the judge stated:

"The court believes the murder of Mr[s]. Johnson would be admissible in the trial for the murder of Mr. Bradshaw, to show motive. Mr. Bradshaw was killed supposedly under the theory of the State to prevent identification. There is a motive, and I think there is a mutuality of admissibility in the trial of the two crimes on the theories as set forth by the State.

I think [*State v. Edison* ] in 318 Maryland 541 [569 A.2d 657] did recognize the consciousness of guilt theory [in] the severance[-]joinder situation, and defendant's murder of Bradshaw is evidence of consciousness of guilt because he allegedly killed Bradshaw to cover up his guilt in the murder of Johnson."

The judge determined that evidence concerning the Johnson murder would be admissible in a trial on the Bradshaw murder because it would be relevant to show motive. The Bradshaw murder was, according to the State's theory, committed to conceal the Johnson murder. This Court has repeatedly stated that motive is one of the "other purposes" that will overcome the presumption of exclusion that pertains to "other crimes" evidence. *Harris v. State,* 324 Md. 490, 501, 597 A.2d 956, 962 (1991); *Faulkner,* 314 Md. at 634, 552 A.2d at 898; *Ross,* 276 Md. at 669–70, 350 A.2d at 684; *see also* Md.Rule 5–404(b).

Evidence concerning the Bradshaw murder, similarly, would be admissible in a trial on the Johnson murder. It would be relevant to show consciousness of guilt by showing that Appellant murdered the only witness to the Johnson killing. This Court has held that consciousness of guilt is an "other purpose" that will overcome the presumption of exclusion that is attached to "other crimes" evidence. *State v. Edison,* 318 Md. 541, 548, 569 A.2d 657, 660 (1990). Evidence of escape from confinement or of flight after a crime is the most common "other crimes" evidence that is offered to show consciousness of guilt. *See Edison,* 318 Md. at 548–49, 569 A.2d at 660–61 (escape from confinement); *Hunt v. State,* 312 Md. 494, 508,

540 A.2d 1125, 1132 (1988)(flight from crime scene). Other attempts to conceal involvement in criminal activity have also been held admissible to show a defendant's consciousness of guilt, however. *See, e.g., Wilkerson v. State,* 88 Md.App. 173, 594 A.2d 597 (1991)(making false statements); *Marshall v. State,* 85 Md.App. 320, 583 A.2d 1109 (destruction of evidence), *cert. denied,* 323 Md. 2, 590 A.2d 159 (1991), *cert. denied,* 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992); *Byers v. U.S.,* 649 A.2d 279, 286 n. 3 (D.C.App.1994) (threatening witnesses); *U.S. v. Rocha,* 916 F.2d 219 (5th Cir.1990) (threatening witnesses), *cert. denied, Hinojosa v. U.S.,* 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991). Mr. Bradshaw was present at the scene of Ms. Johnson's murder and potentially could identify Appellant as Ms. Johnson's murderer. Evidence that Appellant was also responsible for Mr. Bradshaw's murder would be admissible as evidence of Appellant's consciousness of guilt and as an expression of his attempt to conceal his involvement in the murder of Ms. Johnson.

The judge then performed the second step of the joinder analysis. The following excerpt from the transcript, however, reveals that the judge may have given the Appellant more than he was entitled to by lumping together the "other crimes" balance and the joinder balance.

"I agree that there is a very difficult balancing issue when we are admitting evidence of one crime in the trial of another which we do if we join offenses for trial. When we balance judicial economy against prejudice, I believe there is prejudice to the defendant. Judicial economy certainly weighs toward trying them together, but I would not join these matters for trial for the sake of judicial economy in light of the prejudice it would cause the defendant, but the question is the probative nature of the evidence."

The judge then performed the *Faulkner* balancing test, weighing the probative value of the evidence against the prejudice to the defendant:

"It seems to me that where the evidence of consciousness of guilt is offered in the one case, it is very probative, and

where in the other case the evidence of motive, the motive to kill Bradshaw to silence him is very probative. I think that is very probative evidence.... * * *

In weighing the prejudice to the defendant against the probative value of the evidence, the Court believes that the evidence would be properly admitted...."

Clearly, the judge did not have to make this assessment; the balancing test required by *Faulkner* has no part in a joinder analysis.

■■ If a judge has determined that the evidence concerning separate offenses or defendants is mutually admissible then the evidence would have been admissible against the defendant even if severance had been granted. Thus, once a determination of mutual admissibility has been made, any judicial economy that may be had will usually suffice to permit joinder unless other non-evidentiary factors weigh against joinder.

■■ The balancing test is a discretionary function, and this Court will only reverse a trial judge's decision to permit joinder if the decision was a clear abuse of discretion. The judge found that some economy could be effected by joining the two offenses for trial, as evidenced by his statement: "Judicial economy certainly weighs toward trying them together...." We hold that the judge's decision that the "other crimes" evidence was mutually admissible was correct and that his decision to permit joinder was not an abuse of discretion.

## IV.

■■ Appellant next argues that the evidence introduced at trial was insufficient to sustain his convictions for burglary, robbery, and robbery with a deadly weapon. If Appellant is correct as to all three convictions, his felony murder conviction must be reversed, and his sentence of death based on the aggravating factor of robbery or attempt to commit robbery must be reversed. In a criminal case where the sufficiency of the evidence upon which a conviction is based is at issue, the

constitutional standard of review is "whether after considering the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt...." *State v. Rusk,* 289 Md. 230, 245, 424 A.2d 720, 725 (1981)(citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979)); *Williams v. State,* 342 Md. 724, 734, 679 A.2d 1106, 1111 (1996).

 We agree that the evidence was insufficient to sustain Appellant's conviction for burglary of Ms. Johnson's home. The essential elements of the crime of burglary are "the breaking and entering of the dwelling of another at night with the intent to commit a felony." *Williams,* 342 Md. at 734, 679 A.2d at 1112. Appellant argues that the State failed to prove the element of breaking, which can be actual, via forced entry, or constructive, via "artifice, fraud, conspiracy or threats." *Id.*

In *Williams,* this Court reversed a defendant's burglary conviction on the ground of insufficiency of evidence. 342 Md. at 736, 679 A.2d at 1112. In that case, the State had produced no evidence of an actual breaking but had relied, instead, on the theory of constructive breaking. *Williams,* 342 Md. at 735, 679 A.2d at 1112. Testimony offered at trial indicated that one of the homeowners was security conscious and that the house was protected by a security system. *Id.* The State argued that, based on this evidence, the jury could infer that the homeowners would not have left their door open and that the appellant had gained entrance either by opening a door or by fraud or threat. *Id.* This Court held, however, "that any such inference, without more, is insufficient to prove a breaking beyond a reasonable doubt." *Id.*

The evidence of breaking in the present case is, similarly, insufficient to sustain Appellant's conviction for burglary. As in *Williams,* the State failed to produce any evidence of an actual breaking. As to a constructive breaking, the State suggested only that Ms. Johnson was security conscious and always locked her doors. Such evidence, however, is insuffi-

cient to prove a constructive breaking. *Id.* Unlike *Williams,* however, Appellant was a frequent and welcome visitor in the Johnson home. Thus, there is even less evidence upon which a jury could base an inference that Appellant's entrance into the house was gained by "artifice, fraud, conspiracy or threats"; he would just as likely have been invited into the home after knocking on the door. Appellant's conviction of the crime of burglary must be reversed.

The same cannot be said of Appellant's convictions for robbery and robbery with a deadly weapon, however. The essential elements of the crime of robbery are "the felonious taking and carrying away of the personal property of another, from his person or in his presence, by violence or putting in fear." *West v. State,* 312 Md. 197, 202, 539 A.2d 231, 233 (1988). Robbery with a deadly weapon is not a separate substantive offense, but if the State can prove that a defendant used a deadly weapon during the commission of a robbery, the defendant is subject to harsher penalties. Md.Code (1957, 1996 Repl.Vol.), Art. 27, §§ 486, 488; *see Whack v. State,* 288 Md. 137, 140–41, 416 A.2d 265, 266 (1980), *cert. denied and appeal dismissed,* 450 U.S. 990, 101 S.Ct. 1688, 68 L.Ed.2d 189 (1981). Appellant was convicted of robbery and robbery with a deadly weapon, and he argues that this conviction must be reversed because the State failed to prove the element of taking and carrying away. We hold that the convictions are supported by sufficient evidence.

Ms. Johnson regularly kept some money in her wallet, and, on the night of the crime, Ms. Wilson was told by Ms. Johnson that she had twenty dollars. Mr. Johnson testified that when his wife was at home, her wallet was usually kept in her purse, which was stored out of sight. At the scene of the shooting, Ms. Johnson's purse was found on the floor of her bedroom, and her wallet was found, opened and empty of cash, on top of her dresser. From these facts, we hold that a rational trier of fact could have found a taking and carrying away of Ms. Johnson's personal property beyond a reasonable doubt.

Appellant's conviction of robbery with a deadly weapon shall not be reversed. Thus, Appellant's felony murder conviction and his sentence of death based on the aggravating factor of robbery need not be reversed on this ground.

## V.

The next issue presented for our review is whether the admission of evidence that Appellant was involved in offenses other than those for which he was on trial denied him a fair trial or sentencing hearing. Appellant calls our attention to three pieces of testimony, which, he argues, deprived him of a fair trial and sentencing hearing especially "in the context of a jury already improperly exposed to evidence linking Appellant to two murders as a result of the trial court's erroneous denial of the motion to sever." We have previously explained, however, that the decision to sever offenses for trial is left to the discretion of the trial judge and that the judge did not abuse that discretion by denying Appellant's motion to sever in this case. *See* part III, *supra.*

Appellant first asks this Court to consider a portion of testimony given by Charles Johnson. Johnson, who was no relation to Ms. Johnson, the murder victim, was a cellmate of Appellant's. Appellant's counsel recognized, before Johnson was to testify, that he potentially could introduce irrelevant and damaging evidence. Thus, Appellant's counsel said:

"[APPELLANT'S ATTORNEY]: Your Honor, I want to be very sure the jury does not hear. I would appreciate your cooperation, sir.

I want to try to avoid a mistrial here. This Johnson, if allowed to ramble on is going to interject in this case many, many things which would be a clear basis for a mistrial."

Counsel for both parties and the court then agreed that the State's Attorney would help to control Mr. Johnson's testimony by asking leading questions and that the court would warn Mr. Johnson before questioning began that he was only to answer the specific questions asked. The State's Attorney had a brief discussion with Mr. Johnson before he took the

stand, where he testified to Appellant's alleged confession to the murder of Ms. Johnson. The prosecutor then began to question the witness about the murder of Mr. Bradshaw:

"[STATE'S ATTORNEY]: Now, did you have [a] conversation about the occurrences or what happened the next day?

[CHARLES JOHNSON]: He stated the next day he believed that Molek [ (Bradshaw) ] was described as being at the robbery, and that his picture was shown on television. And he make contact with Molek, and they were supposed to meet up to hustle, and he picked Molek up at Molek's house which was near some woods."

At this point Appellant moved for a mistrial, stating at a bench conference that the word "hustle" was "street lingo for robberies," which was just the type of testimony Appellant sought to prevent from reaching the jury. The court denied Appellant's motion. Appellant contends that the court thus admitted "other crimes" evidence without first performing the required procedural analysis outlined in *Faulkner, supra* part II. Therefore, Appellant argues that this Court should reverse the trial court's denial of Appellant's motion for a mistrial.

 Generally, evidence of prior crimes or bad acts is inadmissible to show that an accused has a criminal character or disposition and that the accused, therefore, probably committed the crime for which he is on trial. *Ross,* 276 Md. at 669, 350 A.2d at 684. The evidence about the "hustle," however, was not introduced for such a purpose. In fact, the State's Attorney attempted to prevent the witness from discussing anything other than the murders of Ms. Johnson and Mr. Bradshaw. The prosecutor talked to the witness before he began to testify and asked innocuous and leading questions of the witness once testimony began. The prosecution could in no way have anticipated Johnson's unresponsive answer. Appellant argues, however, that the jury could have been unfairly prejudiced by the statement.

This Court has often stated that whether to declare a mistrial is a decision left to the discretion of the trial judge.

*E.g., Watters v. State,* 328 Md. 38, 50, 612 A.2d 1288, 1294 (1992), *cert. denied,* 507 U.S. 1024, 113 S.Ct. 1832, 123 L.Ed.2d 460 (1993). The trial judge enjoys broad discretion in this area. *Id.* The judge in the instant case considered Appellant's motion and denied it, concluding that there was no necessity to declare a mistrial.

■ This Court will only disturb a trial court's decision to deny a motion for a mistrial if the court has abused its discretion, and it is clear that the accused has been prejudiced. *Johnson v. State,* 303 Md. 487, 516, 495 A.2d 1, 15 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986). We hold that the trial judge did not abuse his discretion by denying Appellant's motion for a mistrial. We cannot say that Appellant was prejudiced by the witness's statement that "they were supposed to meet up to hustle." The word "hustle" would not necessarily be understood by the jurors to mean a robbery. In addition, the reference was brief and was not repeated. Furthermore, our decision here is in accord with other decisions of this Court in which we have held that it was not an abuse of discretion for a trial judge to refuse to declare a mistrial under circumstances arguably more damaging than those in the present case. *See Rubin v. State,* 325 Md. 552, 602 A.2d 677 (1992) (where evidence was admitted that defendant sought treatment at a hospital, after an attempted suicide, on the night of the murder and that defendant had been identified in hospital records under a false name); *State v. Runge,* 317 Md. 613, 566 A.2d 88 (1989) (where judge, in front of jury, made sarcastic comment to defense counsel and mistakenly corrected defense counsel's comment that, in a criminal prosecution, the State is an advocate); *Hunt,* 312 Md. at 494, 540 A.2d at 1125 (where murder victim's family left courtroom in tears while jury listened to tape of police radio communications recorded during the shooting); *Jones v. State,* 310 Md. 569, 530 A.2d 743 (1987) (where witness referred to defendant's presence "at Lewisburg," a federal prison), *vacated, Jones v. Maryland,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (for reconsideration in light of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct.

1860, 100 L.Ed.2d 384 (1988)), *on remand, Jones v. State,* 314 Md. 111, 549 A.2d 17 (1988)(affirming all judgments of trial court except for sentence of death); *Johnson, Jr. v. State,* 232 Md. 199, 192 A.2d 506 (1963) (where police officer was allowed to testify that the defendant had said to the officer: "I guess I messed up last night").

 Appellant also alleges that he was unfairly prejudiced by two of Ms. Wilson's statements. Although Appellant found nothing objectionable about these statements at the time they were made, he now contends that the statements in question were "other crimes" evidence admitted without the appropriate procedural analysis required by *Faulkner, supra* part II. In one of the statements, Ms. Wilson testified that her relationship with Appellant had become violent and that if she returned to the home that she and Appellant shared, one of them would do harm to the other. In the second statement, Ms. Wilson testified that although Appellant was employed as a tractor trailer driver, he often spent his entire paycheck on drugs on the day the paycheck was received.

 We think it highly unlikely that Ms. Wilson's statements prejudiced the jury to such a degree that a new trial or sentencing hearing would be warranted, but we also point out that Appellant did not preserve the issue for our review. Maryland Rule 4-323(a) states, in part: "An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." Appellant made no such objection until he drafted his brief to this Court. Similarly, Md.Rule 8-131(a) states, in part:

> "Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."

Thus, there exists a presumption that this Court will not review any issue that has not been preserved via objection at trial.

 Appellant raises one other theory under which this Court might review the admission of Ms. Wilson's statements despite the lack of proper preservation. This Court has said that in the case of plain error, "that is, error which vitally affects a defendant's right to a fair and impartial trial," we retain the discretion to provide appellate review, although the error was unobjected to. *Rubin*, 325 Md. at 587–88, 602 A.2d at 694 (quoting *State v. Daughton*, 321 Md. 206, 210–11, 582 A.2d 521, 523 (1990)). We have explained, however, that plain error review should only be undertaken when the error is "compelling, extraordinary, exceptional or fundamental to assure the defendant of fair trial." *See State v. Hutchinson*, 287 Md. 198, 203, 411 A.2d 1035, 1038 (1980). Such extenuating circumstances are not present in this case, and, indeed, we would find no error if the issue were presented.

## VI.

Appellant next argues that the trial court erred by allowing his juvenile record to be admitted to the capital sentencing jury and that he is therefore entitled to. a new sentencing hearing. We agree that portions of Appellant's juvenile record were inadmissible and should have been excluded. Because this evidence was inflammatory and highly prejudicial, we reverse Appellant's sentence of death and grant a new sentencing hearing.

## A.

 The evidence complained of was contained in pages 3–5 of the presentence investigation report ("PSI"), a report that must be filed with the court in every capital sentencing proceeding. Md.Code (1957, 1997 Repl.Vol.), Art. 41 § 4–609(d). Appellant asked the court to strike his entire juvenile record from the PSI, or, in the alternative, to strike at least

"any juvenile incident in which a finding of delinquency was not made." The court denied Appellant's motion.

As a result, the jury was presented with evidence that Appellant had been charged with eighteen offenses as a juvenile. PSI at 3–5. On 10/30/81, he was charged with petty theft, for which he was placed under informal supervision with no finding of delinquency. PSI at 3. On 2/12/82, Appellant was charged with assault and battery, robbery, and breaking and entering. All of the charges were nol prossed. PSI at 3. On 2/4/83, he was charged with breaking and entering. He was granted probation without a finding of delinquency. PSI at 3. On 9/21/83, Appellant was charged with breaking and entering and theft. He was found delinquent on both charges and was granted probation. PSI at 4. Appellant was charged with breaking and entering on 12/3/83, 2/10/84 and 2/11/84. The three charges were consolidated in one proceeding, and Appellant was found delinquent of two counts of theft and one count of breaking and entering. He was granted probation. PSI at 4. On 2/16/84, he was charged with breaking and entering, grand theft, and destruction of property. Appellant was found delinquent only of breaking and entering and was granted probation. PSI at 4. On 3/20/84, he was charged with burglary, but the charge was dismissed. PSI at 4. On 4/5/84, he was charged with assault, but the charge was withdrawn. PSI at 4. On 6/1/84, he was charged with theft, but the charge was nol prossed. PSI at 4. On 3/27/85, Appellant was charged with possession of a deadly weapon. The weapon had been stolen from a private residence on 3/2/85, and Appellant was also charged with that theft. The possession and theft charges were consolidated in one proceeding, and Appellant was found delinquent only of the possession offense. He was committed to the Charles Hickey School. PSI at 5.

The State highlighted these offenses during closing arguments:

"When you have the presentence investigation, you will see [Appellant's] ... *extensive juvenile history of criminal type behavior,* and you will see that there were and even Mr. Sickler referred to it to some degree, that he was

placed at the Hickey School or the Maryland Training School as a result of his juvenile delinquency." (Emphasis added).

A finding of delinquency, however, had only been made on seven of the eighteen juvenile charges. PSI at 4–5. Six of the charges, furthermore, had actually been nol prossed, dismissed, or withdrawn. PSI at 3–4. Appellant first contends that the trial court erred in submitting to the sentencing jury evidence concerning the charges in which no finding of delinquency had been made. We agree.

 The admissibility of evidence in a capital sentencing hearing is governed by Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 413(c)(1). "Section 413 is structured to guide the discretion vested in the sentencing authority with 'clear and objective standards' to ensure that the death penalty is not inflicted in an arbitrary and capricious manner in violation of constitutional principles." *Johnson v. State*, 292 Md. 405, 437, 439 A.2d 542, 560 (1982). The Maryland Rules of Evidence do not apply in capital sentencing proceedings. *Whittlesey v. State*, 340 Md. 30, 665 A.2d 223 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996). Instead, subsection (c)(1) describes the evidence that shall be admissible in such a sentencing proceeding.

Section 413(c)(1) states:

"(c) *Evidence* . . . (1) The following type of evidence is admissible in this proceeding:

(i) Evidence relating to any mitigating circumstance listed in subsection (g) of this section;

(ii) Evidence relating to any aggravating circumstance listed in subsection (d) of this section of which the State had notified the defendant pursuant to § 412(b) of this article;

(iii) Evidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures;

(iv) Any presentence investigation report. However, any recommendation as to sentence contained in the report is not admissible; and

(v) Any other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements."

"In determining the admissibility of evidence under § 413(c)(1), the five provisions of the section are read together so as to effectuate the legislative purpose of delineating and circumscribing the type of evidence admissible in [a capital sentencing] proceeding." *Johnson v. State,* 303 Md. 487, 525, 495 A.2d 1, 20 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986) (citing *Scott v. State,* 297 Md. 235, 245–46, 465 A.2d 1126, 1132 (1983)). Thus, this Court has held that any evidence a trial court wishes to admit under subsection (iv) must be relevant to the sentence and reliable under subsection (v), *see Grandison v. State,* 341 Md. 175, 237, 670 A.2d 398, 428 (1995) (holding evidence contained in PSI of defendant's prison infractions for which there was no institutional finding of guilt admissible because relevant to sentence and reliable), *cert. denied,* —— U.S. ——, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996); *Hunt v. State,* 321 Md. 387, 432, 583 A.2d 218, 240 (1990) (holding evidence of defendant's prison infractions contained in PSI admissible after finding evidence to be relevant and reliable), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991), and that subsection (v) does not authorize the admission of evidence that would violate subsections (i) and (iii). *Scott,* 297 Md. at 247–48, 465 A.2d at 1133.

In *Scott,* this Court considered whether, in a capital sentencing hearing for premeditated murder, evidence that the defendant had also committed two unrelated crimes was admissible under § 413(c)(1). 297 Md. at 242, 465 A.2d at 1130. The State contended that the evidence at issue was admissible under subsection (v). *Scott,* 297 Md. at 243, 465 A.2d at 1131. The defendant, however, argued that only evidence that the defendant had been convicted of or had pleaded guilty or nolo contendere to unrelated crimes was admissible. *Id.* We held that subsections (i) and (iii) prohibited the admission of evi-

dence of unrelated crimes, in a death penalty case, if the defendant had not either been convicted of those crimes or entered a plea of guilty or nolo contendere, *Scott,* 297 Md. at 246–47, 465 A.2d at 1133, and explained that subsection (v) did not overcome or negate that prohibition. *Scott,* 297 Md. at 247–48, 465 A.2d at 1133. We held that the admission of evidence concerning the two unadjudicated murder charges constituted reversible error. *Scott,* 297 Md. at 252–53, 465 A.2d at 1135–36.

The State, in the present case, contends that this Court's later decision, *Collins v. State,* 318 Md. 269, 568 A.2d 1, *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990), should control our decision. In *Collins,* we allowed a defendant's juvenile record to be included in the PSI that was submitted to the capital sentencing jury. 318 Md. at 294–95, 568 A.2d at 13–14. One of the pronouncements this Court made in *Collins* has been singled out for attention by the State in the instant case: "[t]he only limit placed upon the admissibility of [PSI] reports is in reference to 'any recommendation as to sentence contained in the report.'" 318 Md. at 295, 568 A.2d at 14. The State argues that under *Collins,* a trial court has the discretion to admit a defendant's entire juvenile record if it is presented as part of a PSI, but the State overlooks the fact that the record in *Collins* consisted only of adjudications.

The defendant's primary basis for challenging the admission of his juvenile record, in *Collins,* was that his juvenile file had been destroyed. *Collins,* 318 Md. at 294, 568 A.2d at 13. He argued that there was no way to prove the accuracy of the juvenile record reproduced in the PSI and that the evidence was therefore *per se* unreliable. *See id.* We held that the evidence was admissible. *Collins,* 318 Md. at 295, 568 A.2d at 14. The juvenile record had been part of an earlier PSI, which was incorporated by reference into the *Collins* PSI. *Collins,* 318 Md. at 294 n. 14, 568 A.2d at 13 n. 14. At the time the earlier PSI was prepared, Collins's juvenile file had not been destroyed and the presentence investigator had checked the juvenile records carefully to verify the information. *Id.* The fact that the juvenile record had since been

destroyed did not make the evidence about the record in the PSI unreliable.

This does not mean, however, that any juvenile record is automatically admissible in a capital sentencing hearing merely because the evidence is contained in a PSI. Rather, the presumption of admissibility of a PSI extends only to "reliable information ... which is of probative value and relevant to sentencing ... provided the defendant is accorded a fair opportunity to rebut any statements." *Hunt,* 321 Md. at 431–32, 583 A.2d at 239.

Appellant's juvenile record lists eleven charges in which no finding of delinquency was made. These mere arrests are not probative of any issue and should not have been permitted to influence the jury. "[E]vidence of an arrest (as distinguished from actual acts of misconduct) is not relevant, 3A WIGMORE ON EVIDENCE, Sec. 980 a [ (1970) ], and if admitted is not harmless error because of its potential prejudicial effect upon a jury." *Chenault v. Director,* 28 Md.App. 357, 361, 345 A.2d 440, 443 (1975). We hold that it was reversible error to inform this capital sentencing jury of Appellant's numerous juvenile charges in which there had been no adjudication resulting in a finding of delinquency, just as it would be to inform the jury of adult charges in which there had been no adjudication resulting in a conviction. *See State v. Tichnell,* 306 Md. 428, 509 A.2d 1179 (would have been reversible error to admit evidence of defendant's mere arrests at capital murder trial, but error was cured by court's jury instruction), *cert. denied,* 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986); *Henry v. State,* 273 Md. 131, 147–48, 328 A.2d 293, 303 (1974) (quoting *Henry v. State,* 20 Md.App. 296, 314, 315 A.2d 797, 807 (1974)(Davidson, J., concurring and dissenting) ("[I]t has been recognized that when they stand alone, bald accusations of criminal conduct for which a person either has not been tried or has been tried and acquitted may not be considered by the sentencing judge.")); *Craddock v. State,* 64 Md.App. 269, 494 A.2d 971 (would have been error for judge to consider mere arrests during sentencing phase of trial, but judge presumed to know

that such evidence could not be considered and no evidence in record that judge did consider such evidence), *cert. denied,* 304 Md. 297, 498 A.2d 1184 (1985); *Chenault,* 28 Md.App. at 360–61, 345 A.2d at 443 (error, in a defective delinquency civil hearing, for judge to consider evidence of an arrest); *Wentworth v. State,* 33 Md.App. 242, 364 A.2d 81 (1976) (error, in a defective delinquency civil hearing, to admit evidence of mere arrests).

■ Thus, although information contained in a PSI generally will be admissible pursuant to § 413(iv), a party may object to the admission of any information that would not fall within any subsection of (c)(1), has no relevance, and is unduly prejudicial. Of the eighteen charges listed on Appellant's juvenile record, a finding of delinquency had been made on only seven of those charges. The remaining eleven charges, in effect, mere arrests, are analogous to, in the criminal system, charges for which there has been no conviction or plea of guilty or of nolo contendere. The admission of such evidence, which is not "of probative value and relevant to sentence," during Appellant's capital sentencing hearing violated § 413(c)(1)(iii) and (v). *See Bowers v. State,* 306 Md. 120, 153, 507 A.2d 1072, 1088–89 (1986) (holding explanation of length of time one might serve under life sentence inadmissible because not "of probative value and relevant to sentence").

The State contends that if the admission to the jury of the seven unadjudicated juvenile charges was error, the error was, at most, harmless. As this Court explained in *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976), an error may be deemed "harmless" in a criminal case only if "a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict. . . ." *See also Evans v. State,* 333 Md. 660, 683, 637 A.2d 117, 128–29 (applying *Dorsey* to evidence admitted at capital sentencing hearing), *cert. denied,* 513 U.S. 833, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994). Otherwise, the reviewing court must reverse. *Dorsey,* 276 Md. at 659, 350 A.2d at 678. In the instant case, we cannot

say beyond a reasonable doubt that the unadjudicated juvenile charges in no way influenced the jury to hand down a sentence of death.

Appellant was a relatively young man when the jury considered his sentence. The majority of the jury's information about Appellant, therefore, concerned his juvenile years. By presenting eighteen charges on the juvenile record, the jury saw what looked like a continuous stream of misconduct from ages 14 to 18, amounting to an average of over four offenses per year. Furthermore, some of those unadjudicated charges concerned the violent offenses of assault, assault and battery, and robbery. In fact, Appellant was found delinquent seven times as a juvenile, and all of the findings of delinquency concerned non-violent offenses. By presenting eleven inadmissible, unadjudicated charges, the PSI presented a distorted picture of Appellant's juvenile criminal history, which the Prosecutor capitalized on by calling attention to the "extensive juvenile history of criminal type behavior" in his closing argument. We cannot say beyond a reasonable doubt that this distorted juvenile history in no way influenced the jury's verdict. Thus, we must reverse Appellant's sentence of death and remand the case for a new sentencing hearing.

### B.

This leaves seven charges on Appellant's juvenile record in which a finding of delinquency was made. Appellant argues that this evidence was also inappropriately admitted to the sentencing jury. Because the State will undoubtedly attempt to have these charges admitted at the new sentencing hearing, we will consider Appellant's remaining arguments concerning the charges in order to provide guidance to the trial court.

Appellant argues that the seven charges in which a finding of delinquency was made are inadmissible to the sentencing jury for three reasons: (1) the remaining offenses were not "statutory crimes of violence," (2) the record contained inflammatory and detailed evidence of the underlying facts sur-

rounding the charges, and (3) Appellant was not represented by counsel on any of the charges.

(1)

 Appellant first argues that *Scott* "restricts the type of evidence relating to other crimes that is admissible ... to evidence of *crimes of violence* for which there has been a conviction." (Emphasis added). Appellant's Brief at 54, 55 (quoting *Scott,* 297 Md. at 247, 465 A.2d at 1133). "Crimes of violence" is defined in § 413(g)(1), which states, in part:

"As used in this paragraph, 'crime of violence' means abduction, arson in the first degree, escape, kidnapping, manslaughter, except involuntary manslaughter, mayhem, murder, robbery, carjacking or armed carjacking, or rape or sexual offense in the first or second degree, or an attempt to commit any of these offenses, or the use of a handgun in the commission of a felony or another crime of violence."

None of the remaining six offenses on Appellant's juvenile record could be defined as crimes of violence under § 413(g)(1). Appellant contends, therefore, that evidence concerning these offenses was inadmissible. He has considered a lone phrase out of context, however, and has misconstrued *Scott*'s discussion of § 413(g).

In *Scott,* we explained that § 413(c)(1)(i) makes admissible, in a capital sentencing hearing, any evidence relating to the mitigating circumstances listed in subsection (g). 297 Md. at 246, 465 A.2d at 1132. Subsection (g)(1) lists the following mitigating circumstances:

"The defendant has not previously (i) been found guilty of a crime of violence; (ii) entered a plea of guilty or nolo contendere to a charge of a crime of violence; or (iii) had a judgment of probation or stay of entry of judgment entered on a charge of a crime of violence."

We then said of § 413(g)(1):

*"This specific enumeration restricts the type of evidence relating to other crimes that is admissible to evidence of crimes of violence for which there has been a conviction.*

> Thus, § 413(c)(1)(i) establishes a more stringent standard of relevance for the admission of evidence relating to other crimes in a death penalty case than is applied in a nondeath penalty case. That section establishes that a lack of a conviction of a crime of violence is a mitigating circumstance to be taken into account and given some weight. It precludes, in a death penalty case, the admission of evidence of crimes of violence for which there have been no convictions, evidence that may well result in the mitigating circumstance of the absence of prior convictions being outweighed or, in essence, 'wiped out' or eliminated." (Emphasis added).

*Scott*, 297 Md. at 247, 465 A.2d at 1133.

When read in context, it is clear that the phrase quoted by Appellant relates only to evidence of mitigating circumstances under § 413(c)(1)(i). *See Johnson*, 303 Md. at 529, 495 A.2d at 22 ("Section 413(g)(1), through § 413(c)(1)(i), explicitly permits evidence of past convictions of violent crime. . . ."). Thus, in *Calhoun v. State*, this Court held admissible, in a capital sentencing hearing, evidence of the defendant's misconduct that was not a crime of violence as defined in § 413(g). 297 Md. 563, 601, 468 A.2d 45, 62–63 (1983) (if charges had been brought, the crime charged would have been battery), *cert. denied sub nom., Tichnell v. Maryland,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). In *Grandison*, we held admissible, in a capital sentencing hearing, a PSI which contained evidence of the defendant's prior convictions and uncharged prison infractions, which were not crimes of violence as defined in § 413(g). 341 Md. at 212–13, 235–38, 251–53, 670 A.2d at 416, 427–28, 435 (evidence included charges of witness tampering, interfering with the right to be a witness in a judicial proceeding, narcotics violations, and throwing shaving powder in the face of a prison guard).

Appellant's juvenile adjudications, in the present case, were offered under § 413(c)(1)(iv), not under § 413(c)(1)(i). Thus, it is of no consequence that Appellant's adjudicated charges are not definable as crimes of violence.

(2)

In *Scott*, this Court interpreted § 413(c)(1)(iii) to preclude, in a death penalty case, "inflammatory detailed evidence of the underlying facts and circumstances surrounding unrelated crimes." 297 Md. at 247, 465 A.2d at 1133; *see also Colvin-el v. State*, 332 Md. 144, 159, 630 A.2d 725, 732 (1993). Appellant argues that such inflammatory details were submitted to the sentencing jury in this case.

At issue are five statements, each one to four sentences in length, describing some of Appellant's juvenile charges. Beneath the 2/4/83 charge of breaking and entering, for which no finding of delinquency was made, the record reads: "The defendant and three juvenile co-defendants were charged in this case with breaking into a storage room of an apartment complex." PSI at 3. Whether or not this statement reveals "inflammatory" details about the charge, the description must be redacted from the PSI at Appellant's resentencing hearing because, pursuant to part (A), the corresponding charge for which there was no finding of delinquency must be redacted.

The remaining four statements, however, concern charges for which there were findings of delinquency. If these four statements do not disclose "inflammatory" details, they may be admitted as part of the PSI during Appellant's resentencing hearing. Statement number one, which corresponds to the finding of delinquency on the 9/21/83 charge of breaking and entering and theft, the record reads: "Conyers was charged with breaking into a private residence." PSI at 4. Statement number two, which corresponds to findings of delinquency, made on 4/2/84, on two counts of theft and one count of breaking and entering states:

"The defendant was charged in the above cases with three separate Breaking and Enterings. The 12/3/83 offense involved a private residence from which tools, jewelry, liquor, a camera, video tapes, a video cassette recorder, and television were taken. The 2/10/84 crime involved the theft of jewelry, a stereo, United States currency, a camera, and a telephone from a private home. The offense which occurred

on 2/11/84 involved the theft of a stereo, a camera, a computer, video cassettes, and jewelry from a private home."

PSI at 4. As explained above, Appellant was only found delinquent on one charge of breaking and entering, but the other two charges resulted in two findings of delinquency of theft. PSI at 4.

The third statement on the juvenile record, which corresponds to the finding of delinquency on the 2/16/84 charge of breaking and entering, reads: "Conyers and a co-defendant broke into a private residence and took various items including guns, jewelry, and a stereo." PSI at 4. Statement number four, which corresponds to the finding of delinquency on the 3/27/85 charge of possession of a deadly weapon, explains: "The defendant was charged in the above case after a consented search of his residence revealed a sawed-off shotgun which had been reported stolen from a home on 3/2/85." PSI at 5. As we explained above, Appellant was charged with the 3/2/85 theft, but he was not found delinquent of that charge.

Appellant argues that these descriptions violate *Scott*'s prohibition against the admission of "inflammatory detailed evidence of the underlying facts and circumstances surrounding unrelated crimes." He specifically states: "Among the more prejudicial details [contained in the descriptions] were the theft of "guns" from one of the residences, and the recovery of a reportedly stolen sawed-off shotgun from Appellant's residence in a separate incident." We disagree that the four descriptions explaining charges for which Appellant was found delinquent were "inflammatory" or prejudicial.

The brief descriptions at issue may have been included on the actual petition under which Appellant was charged. If they were, and if the information was accurate, then their submission to the jury was permissible. Even if the brief descriptions were not reflected on the petition under which Appellant was charged, however, if the descriptions were accurate, their introduction to the jury would not be prejudicial because the descriptions disclose little more than was

disclosed by the findings of delinquency themselves. *See Grandison v. State*, 305 Md. 685, 758, 506 A.2d 580, 617, *cert. denied*, 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986). Finally, Appellant concedes that the most damaging detail contained in the descriptions was likely that guns were stolen on two occasions, and that detail can hardly be considered "inflammatory." The brief descriptions corresponding to the juvenile charges in which Appellant was adjudicated delinquent were admissible.

The fourth statement explains a charge for which there was a finding of delinquency, but the statement also refers to a theft for which Appellant was charged but was not found delinquent. The words "which had been reported stolen from a home on 3/2/85," should be redacted at resentencing because, pursuant to part (A), the corresponding charge of theft must be redacted.

(3)

The last allegation of error regarding the admission of Appellant's juvenile record concerns his representation by counsel, or lack thereof, on the juvenile charges. The spaces on Appellant's record that are meant to indicate whether he was represented by counsel on his juvenile charges were left blank. We assume, however, that more complete information will be available at Appellant's new sentencing hearing.

C.

In sum, seven of the eighteen charges listed on Appellant's juvenile record, and many of the brief descriptions contained on the record were appropriately admitted to the sentencing jury via the PSI. All of the remaining charges, however, amount to "mere arrests," which are not probative or relevant for any purpose. Appellant was substantially and unfairly prejudiced by this evidence, and we must reverse his sentence of death and grant a new sentencing hearing.

Appellant raises several other issues related to the sentence of death. Our grant of a new sentencing hearing makes these issues moot.

## VII.

■■■ Finally, Appellant argues that Maryland's death penalty statute is unconstitutional because (1) it requires the defendant to establish mitigating circumstances by a preponderance of the evidence; (2) it requires the defendant to establish that arguably mitigating circumstances that are not enumerated in the statute are, in fact, mitigating circumstances; and (3) it requires a death sentence when aggravating circumstances outweigh mitigating circumstances by a preponderance of the evidence rather than by some higher standard.

We respond with an excerpt from our recent opinion, *Perry v. State*, 344 Md. 204, 686 A.2d 274 (1996), *pet. for cert. filed* (Jan. 9, 1997), wherein Perry's counsel advanced precisely the same arguments:

> "We have addressed these claims in prior cases and have rejected each of them. *See Grandison v. State*, 341 Md. 175, 231, 670 A.2d 398, 425 (stating that a similar claim, 'though made time and time again over the years, has been consistently rejected by this Court'), *cert. denied*, —— U.S. ——, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996); *Whittlesey v. State*, 340 Md. 30, 82–83, 665 A.2d 223, 249 (1995) (rejecting similar constitutional challenges to Maryland death penalty statute), *cert. denied*, —— U.S. ——, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996); *Wiggins v. State*, 324 Md. 551, 582–83, 597 A.2d 1359, 1374 (1991) (finding no merit in challenges to defendant's burden regarding statutorily recognized and other mitigating factors and to burden of proof), *cert. denied*, 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992)."

*Perry*, 344 Md. at 247–48, 686 A.2d at 295.

*JUDGMENTS AFFIRMED, EXCEPT THE CONVICTION FOR BURGLARY IS REVERSED AND THE IMPOSITION OF THE DEATH SENTENCE FOR THE*

*MURDER OF WANDA JOHNSON IS VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR WICOMI- CO COUNTY FOR A NEW SENTENCING PROCEEDING UNDER § 413 OF ART. 27. COSTS TO BE EQUALLY DIVIDED.*